UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DANIEL UBERT ESPINO, | CASE NO. 5:22-CV-01544-DAC |
| Plaintiff, | MAGISTRATE JUDGE DARRELL A. CLAY |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

INTRODUCTION

Plaintiff Daniel Ubert Espino challenges the decision of the Commissioner of Social Security denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On September 1, 2022, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated Sept. 1, 2022). On October 17, 2022, the parties consented to my exercising jurisdiction under 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (ECF #8). Following review, and for the reasons stated below, I **AFFIRM** the Commissioner's decision denying DIB and SSI.

PROCEDURAL BACKGROUND

Mr. Espino filed for DIB on December 12, 2019 and for SSI on April 7, 2020; each application alleged a disability onset date of August 1, 2017. (Tr. 488, 490). His claims were denied

1

initially and on reconsideration. (Tr. 339, 351). Mr. Espino then requested a hearing before an administrative law judge. (Tr. 410-11). Mr. Espino (represented by counsel) and a vocational expert (VE) testified before the ALJ on October 13, 2021. (Tr. 305-38). On March 4, 2022, the ALJ issued a written decision finding Mr. Espino not disabled. (Tr. 277-304). The Appeals Council denied Mr. Espino's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-9; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, and 416.1481). Mr. Espino timely filed this action on August 31, 2022. (ECF #1).

FACTUAL BACKGROUND

## I.   PERSONAL AND VOCATIONAL EVIDENCE

Mr. Espino was 59 years old on the alleged onset date, and 64 years old at the administrative hearing. (Tr. 488). He completed high school and has worked as a firefighter, construction worker, and truck driver. (Tr. 365, 58).

## II.   RELEVANT MEDICAL EVIDENCE[1]

On January 16, 2019, Mr. Espino treated with Jesse Hoff, M.D., at the Farmington, Missouri VA clinic. (Tr. 670). Mr. Espino described "ongoing debilitating disequilibrium episodes" characterized by visual disturbance, sweats, and nausea, which could last up to fifteen minutes and seemed worse when he skipped breakfast or did not take his hypertension medication, Lisinopril. (*Id.*). He reported "a couple falls over the years" resulting in hip and back pain. (*Id.*). An MRI of Mr. Espino's head showed no abnormality in his "balance system." (Tr. 642, 666). X-rays of his lumbar spine revealed degenerative skeletal change and minimal thoracolumbar (TL) scoliosis,

---

[1]   Mr. Espino challenges the ALJ's failure to adopt certain physical limitations in the residual functional capacity determination; therefore, I limit my discussion of the medical evidence to that relating to his physical conditions.

osteophytosis, and disc space narrowing compatible with chronic disc disease, and grade 1 spondylolisthesis of L5 on S1. (Tr. 643). Dr. Hoff suggested arthritis medication. (Tr. 643-44, 666). Mr. Espino also had his hearing aids cleaned and checked. (Tr. 665).

Mr. Espino returned to Dr. Hoff in September 2019, complaining his tinnitus was "practically disabling" and describing how it "affects his hearing in his home relationships." (Tr. 662). He discussed past carpal tunnel surgery, and recounted episodes of hand and total arm numbness. (*Id.*). He had been taking Lisinopril but needed a new cuff to monitor his blood pressure, which Dr. Hoff measured at 124/72. (Tr. 662, 751). Dr. Hoff again discussed the result of Mr. Espino's MRI with him. (Tr. 662). Physical examination was normal except for nystagmus on eye tracking. (Tr. 663-64). Dr. Hoff observed Mr. Espino wore a hearing aid on the left side only. (Tr. 663).

The next year, in October 2020, Mr. Espino reported for follow-up with Dr. Hoff at the Farmington VA clinic. (Tr. 740-41). Mr. Espino admitted he had not been monitoring his blood pressure or taking his medication as prescribed; he said he forgot to get his medication refilled. (Tr. 742). He conveyed the diuretic effect of hydrochlorothiazide that made truck driving difficult. (*Id.*). He was still bothered by tinnitus, and occasionally experienced headaches for which he used over-the-counter medication. (*Id.*). Mr. Espino's examination was normal, including normal functional grip in both hands and no gait abnormalities. (Tr. 743).

On February 9, 2021, Deborah Wagner, PA-C, performed a consultative examination. (Tr. 676). Mr. Espino told her he ran out of Lisinopril and had not refilled it; his blood pressure was 175/122. (*Id.*). He said his daily activities included cooking, cleaning, laundry, and personal care; he also shopped once a week. (Tr. 677). During the examination, his gait, squat, ability to get on

and off the examining table, and ability to rise from his chair were all normal. (Tr. 678). His ear, nose, and throat were normal. (*Id.*). His musculoskeletal examination was largely normal, but he exhibited mild pain of his right sacroiliac joint on palpation. (Tr. 679). Mr. Espino's neurological examination and extremities were both normal, and he retained normal hand and finger dexterity and grip strength. (*Id.*). Mr. Espino was not wearing his hearing aids; he had a difficult time hearing during the examination, but could hear PA Wagner when she spoke loudly. (Tr. 679-80). She diagnosed hypertension, hearing loss, carpal tunnel syndrome, and right hip arthritis. (Tr. 680). She noted a well-healed scar from past carpal tunnel surgery, but clinical testing did not reveal signs of the syndrome and his grip strength was normal. (*Id.*). The evidence suggested Mr. Espino's hip complaints could be right sacroiliitis. (*Id.*).

On March 26, 2021, Mr. Espino saw a hearing specialist, who reported asymmetrical mild to severe hearing loss in both ears. (Tr. 685). He communicated well with an "amplifier" in ear, but said he lost his right hearing aid and his left hearing aid was not working. (*Id.*). He asked for repetition several times without the amplifier but communicated well with it. (*Id.*). His speech was clear and he had good word recognition. (*Id.*).

On May 20, 2021, Mr. Espino returned to see Dr. Hoff, feeling off balance, a sensation of "tremendous pressure" in his head, headaches at times, and feeling like he might fall. (Tr. 737). Dr. Hoff reminded Mr. Espino of past normal tests, but Mr. Espino said his symptoms were getting worse. (Tr. 736-37). Mr. Espino's examination was normal, including no nystagmus, no problems with walking, and normal grip. (Tr. 738). Dr. Hoff planned a CT scan of Mr. Espino's head "despite the fact that he had [an] MRI scan [in] 2019." (*Id.*). Mr. Espino also planned an appointment with an ear, nose, and throat specialist (ENT). (*Id.*).

4

The July 7, 2021 CT scan showed no acute findings, with "minimal" white matter ischemic change, "minimal" cerebral atrophy, vascular calcification, and "questionable" mild left mastoiditis (a type of infection). (Tr. 712). The same day, Mr. Espino had a hearing test, reporting he lost one of his hearing aids and the other broke. (Tr. 729). The hearing test again showed severe hearing loss; it also showed worsening word recognition, with 80 percent word recognition on the right side and 72 percent on the left. (Tr. 729-30).

On August 11, 2021, ENT specialist Rita Schuman, M.D., examined Mr. Espino. (Tr. 765-66). He reported five episodes of vertigo in the last ten years, with the most recent episode four years ago. (Tr. 765). His symptoms typically lasted for minutes to hours. (*Id.*). Dr. Schuman diagnosed Mr. Espino with peripheral vertigo and sensorineural hearing loss. (Tr. 766). Mr. Espino planned to move to Ohio, where he would seek additional ENT care. (*Id.*).

On October 20, 2021, Mr. Espino underwent a VA examination by Somphet Manivong, N.P., overseen by Christopher Wood, P.T.,[2] to provide a functional assessment for another disability program. (Tr. 839-40). Mr. Espino described his history of vertigo, dislocating his shoulder, and occasional pain in his right hip and lower back. (Tr. 840). He said his back pain flared "yesterday as a result of shoveling stones for several hours." (*Id.*). Examination revealed Mr. Espino had slightly reduced strength ("4+/5") in his left shoulder but was otherwise normal in his upper and lower extremities. (Tr. 842). PT Wood determined Mr. Espino showed signs and symptoms consistent with vertigo; the symptoms occurred because of Mr. Espino's position, and

---

[2]     The records suggest the examination and opinion were overseen by PT Wood and actually given by NP Manivong. However, the ALJ and the parties refer to this examination and opinion as that of PT Wood. In the interest of clarity and consistency, I do the same.

typically resolved in 20 to 30 seconds. (Tr. 846). Mr. Espino complained of pain but did not demonstrate any change in his mechanics due to pain. (*Id.*).

PT Wood believed Mr. Espino should be limited to occasionally handle on the left side; occasionally rotate his head/neck; occasionally rotate the trunk bilaterally, occasionally stoop and climb ramps or stairs; never kneel or crawl; and frequently lift up to 20 pounds. (*Id.*). According to notes from this assessment, Mr. Espino "tested into a sedentary to light work category. This is primarily based on his orthopedic conditions and not his vestibular condition." (Tr. 863). PT Wood also suggested vestibular testing. (Tr. 846).

In December 2021, Mr. Espino underwent a vestibular test to assess his dizziness. (Tr. 848). He reported experiencing dizziness every day lasting up to three minutes. (*Id.*). A video head impulse test yielded limited results due to interference from Mr. Espino's eyelashes but was negative for vestibular problems. (Tr. 850). Posturography (measuring postural sway) and videonystagmography (measuring involuntary eye movement) tests were also normal. (Tr. 850-51).

Mr. Espino provided additional evidence to the Appeals Council after the ALJ's decision. In January 2022, Mr. Espino presented to Gautam Korakavi, M.D., at the Cleveland VA clinic, reporting a history of episodic vertigo since 2013 when a work colleague detonated a Ziploc bag of acetylene that exploded and caused very loud bilateral tinnitus and nausea for several hours. (Tr. 64). Since then, Mr. Espino suffered from two major and two minor episodes; episodes were typically less than one minute at the longest but caused an hour of nausea, vomiting, and headaches afterward. (*Id.*). The last incident occurred three years ago. (Tr. 68). After reviewing testing, Dr. Korakavi believed Mr. Espino's symptoms were more consistent with a vestibular migraine rather than an atypical Meniere's disease as another ENT suggested in 2017. (*Id.*).

Although the condition occurred infrequently, treatment notes reflect Mr. Espino requested further work-up and diagnosis of his condition "as it causes him undue anxiety." (*Id.*). Imaging showed no evidence of mass or abnormal enhancement involving the cranial nerves. (Tr. 66). A videonystagmography revealed unilateral weakness of the left ear. (Tr. 67).

In February 2022, Mr. Espino saw neurologist John Stahl, M.D., who remarked on the difficulty of diagnosing vertigo symptoms. (Tr. 31). Dr. Stahl observed "significant variability in patient accounts of the history" and "the constellation of complaints fits poorly with any one diagnosis." (*Id.*).  He disagreed with a previous ENT's diagnosis of Meniere's disease and vestibular paroxysmia, suggesting the symptoms may be the result of episodic phenomena like vestibular seizures, pheochromocytoma, angina, or panic disorder. (*Id.*). He recommended a conservative approach of treating Mr. Espino's "unquestionable" sleep apnea, which "could be a trigger for migraines" and "might also clear up the symptom pattern a bit." (*Id.*). Dr. Stahl's notes reflected Mr. Espino's desire to "get to the bottom of it" so he could obtain social security benefits. (*Id.*).

## III. MEDICAL OPINIONS

State agency medical consultants reviewed Mr. Espino's medical records at both the initial and reconsideration levels. Nancy Ceasar, M.D., found Mr. Espino suffered from hypertension, hearing loss in both ears, carpal tunnel syndrome in the left wrist, and arthritis in the right hip. (Tr. 349). Dr. Ceasar did not assess Mr. Espino's RFC because he failed to return paperwork outlining his activities of daily living. (*Id.*). Dr. Ceasar noted:

> Claimant failed to return ADLs. Numerous phone calls were made and letters issued with no response to the most recent evidence letter. The medical evidence in file established that the claimant has a severe medically determinable impairment of degenerative disc disease that does not meet or equal a listing. However, the evidence is insufficient to rate limitations on a particular impairment, symptoms, or

alleged limitations, because the evidence necessary for a full medical evaluation is not available due to claimant's failure to cooperate.

(*Id.*) (cleaned up).

James Schell, M.D., evaluated Mr. Espino's medical records at the reconsideration level. (Tr. 357). Dr. Schell found Mr. Espino suffered from disequilibrium and Meniere's disease, high blood pressure, low back pain, and right hip pain. (*Id.*). He was able to assess Mr. Espino's ADLs, which included light chores, light cooking, and yard work once a month with no problems standing, squatting, bending, reaching, or kneeling, but observed heavy lifting affects his vertigo. (*Id.*). Dr. Schell concluded Mr. Espino's allegations were not fully consistent with the medical record, finding no exertional, postural, manipulative, or visual limitations; hearing limitations in both ears; he could tolerate unlimited exposure to extreme temperature, wetness, humidity, fumes, odors, dusts, gases, and poor ventilation; and he should avoid concentrated exposure to noise, vibration, and hazards such as machinery and heights. (Tr. 357-58).

## IV.  ADMINISTRATIVE HEARING

At the October 13, 2021 hearing before the ALJ, Mr. Espino and VE Zachariah Langley testified. (Tr. 307).

Mr. Espino last worked in 2017. (Tr. 312). From 2006 to around 2010 or 2011, he operated equipment to grow alfalfa hay, including a hay rake, a baler, and a stack cruiser designed to pick bales up out of the field and stack them. (Tr. 313). He did not have to lift any weight in this role unless a machine broke, in which case he would lift bales up to 120 pounds, 22 inches high, 18 inches wide, and three feet long. (Tr. 314).

Mr. Espino then began commercial truck driving on multi-day trips for various companies. (Tr. 314-15). He did not load, unload, or maintain the trucks. (Tr. 315). He was required to pull or

8

push the converter dolly, weighing from 60 to 90 pounds, to hitch trucks together. (Tr. 315-16). He stopped driving after experiencing vertigo caused by turning his head to do a lane check while driving 70 miles per hour on the highway. (Tr. 316). A co-driver was there to grab the wheel and maneuver the truck safely to the side of the road. (*Id.*). Mr. Espino went to nearest hospital after the incident. (Tr. 317).

He experienced seven or eight additional vertigo episodes over the subsequent ten years. (*Id.*). During a vertigo episode, his head flushes, his mouth waters, and he loses his vision. (*Id.*). He puts his head down and closes his eyes to subdue the symptoms and maintain the pressure. (Tr. 317-18). Eating healthy is difficult for truck drivers, and Mr. Espino believes his resulting high blood pressure contributes to the vertigo episodes. (Tr. 318). He now takes Lisinopril and a water pill to control his blood pressure. (Tr. 319). He is 5'9" and has consistently weighed 232 pounds. (*Id.*).

At the time of the hearing, Mr. Espino had recently moved to Ohio from Missouri. (Tr. 320). In Missouri, the hospital was 100 miles away and he did not have a vehicle. (*Id.*). While living there, he experienced a vertigo episode, causing him to fall on his steps and fracture five ribs. (*Id.*). He moved to Ohio to be closer to family and have better access to care. (*Id.*).

Mr. Espino is right-handed and has carpal tunnel in both hands, worse in his left. (Tr. 322). He could not pick up a quarter flat on a table. (*Id.*). He can pick up a full gallon of milk and carry it 15 feet with his right hand only; if he tried with his left, he would have no grip and the gallon would fall out of his hand. (*Id.*). When driving trucks, his hand and arm fall asleep within 15 or 20 minutes. (Tr. 323). He must either stand up or move, raising his arm, to alleviate the

numbness. (*Id.*). To use his hands for another 20 minutes, he would need to stop for at least 10 or 15 minutes. (Tr. 323, 326).

Mr. Espino was diagnosed with joint arthritis and has been experiencing pain in his low back and hips since 2006. (Tr. 323, 325). During a flare-up, he cannot stand due to pain. (Tr. 323). He can sit in a desk chair with both feet on the ground or in the seat of a truck cab for 20 to 30 minutes at most. (*Id.*). If he does not move, his legs go numb and he experiences severe pain in his low back. (Tr. 324). He can stand for no more than 15 minutes without leaning on something. (*Id.*).

Separate from vertigo episodes, Mr. Espino gets dizzy every time he bends over to the point where he must stop what he is doing and sit down. (*Id.*). This happens at least two to three times a day. (*Id.*). Adding the instances per day together, he spends an hour in total sitting due to dizziness. (*Id.*).

Mr. Espino's blood pressure medications have somewhat helped his vertigo. (Tr. 328). He started taking Linisopril in 2011 through the VA in Ohio, and moved between Missouri, Ohio, and Arizona over the next few years, with a gap in treatment sometime between 2014 and 2015. (Tr. 330).

VE Langley then testified. He categorized Mr. Espino's past work as farm machine operator (DOT 409.683-010, heavy exertion, SVP 3) and tractor trailer truck driver (DOT 904.383-010, medium exertion, SVP 4). (Tr. 333-34).

**Hypothetical One.** VE Langley first assumed a hypothetical individual of Mr. Espino's age, education, and work experience, able to perform at medium exertion subject to the following limitations: never climb ropes and scaffolds; frequently stoop, kneel, crouch, and crawl; frequently

10

reach, handle, finger, and feel bilaterally; avoid concentrated exposure to noise above level 3 (or

moderate, as the term is defined from the Selected Characteristics of Occupational Exploration);

and avoid all exposure to workplace hazards such as operational control of moving machinery and

unprotected heights. (Tr. 334-35). VE Langley testified the individual could not perform Mr.

Espino's past work but could work as a floor waxer (DOT 381.687-034), warehouse worker (DOT

922.687-058), and counter supply worker (DOT 319.687-010). (Tr. 335-36). All three positions are

medium exertion, SVP 2. (*Id.*).

**Hypothetical Two.** VE Langley next assumed the same individual from Hypothetical One,

limited to only occasional handling, fingering, or feeling, either independently or in combination.

(Tr. 336). The ALJ essentially asked whether, if any combination of the three (handling, fingering,

or feeling) were changed from "frequent" to "occasional," the individual could still perform the

three jobs already listed. To the extent the VE understood the question, he may have misspoken;

in any event, the VE's answer was inconsistent with the DOT:

> ALJ: All right. So if handling, fingering, or feeling, either independently or in combination, were reduced to occasional, would those jobs be eliminated?
>
> VE: On the floor waxer it would not, if the fingering was reduced only. It's frequent, frequent, not present. On the warehouse worker, yes, it's frequent across the board. And counter supply worker is occasional on fingering, so frequent, frequent, occasional.

(Tr. 336).[3]

---

[3]     The VE misstates the requirements for all three jobs. Floor waxer requires frequent handling, but no fingering or feeling, not "frequent, frequent, not present" as the VE stated. 1991 WL 673262 (floor waxer). Warehouse worker requires frequent handling and fingering, but feeling is not present, not "frequent across the board." 1991 WL 688132 (warehouse worker or "laborer, stores"). And counter supply worker requires frequent handling, occasional fingering, and no feeling as opposed to the VE's testimony of "frequent, frequent, occasional." 1991 WL 672772 (counter-supply worker).

The ALJ then asked whether a limitation to never balance would eliminate work at the medium level of exertion. (*Id.*). VE Langley testified it would not, because none of the three positions require maintaining equilibrium on uneven, erratically moving, or slippery surfaces. (*Id.*).

## THE ALJ'S DECISION

The ALJ's decision included the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.

2. The claimant has not engaged in substantial gainful activity since August 1, 2017, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. The claimant has the following severe impairments: bilateral hearing loss; degenerative disc disease; degenerative joint disease; carpal tunnel syndrome (status post carpal tunnel release surgery); and obesity (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except never climb ladders, ropes or scaffolds; never balance as that term is defined in the Selected Characteristics of Occupational Exploration (SCOE), Appendix C paragraph 3; frequently climb ramps and stairs; frequently stoop, kneel, crouch, crawl; frequently reach, handle, finger, and feel bilaterally; avoid exposure to more than a moderate noise intensity level as described and defined in the SCOE, Appendix D, paragraph 5; avoid all exposure to work place hazards such as operational control of moving machinery and unprotected heights.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on August 14, 1957 and was 59 years old, which is defined as an individual of advanced age, on the alleged disability onset

date. The claimant subsequently changed age category to closely approaching retirement age (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from August 1, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 283-98).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a),

1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and

416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One

through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to

establish whether the claimant has the residual functional capacity to perform available work in

the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age,

education, and past work experience to determine if the claimant could perform other work. *Id.*

Only if a claimant satisfies each element of the analysis, including inability to do other work, and

meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) and 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Mr. Espino argues the ALJ erred in constructing the RFC "from whole cloth" through his own lay opinion of the record rather than relying on a medical opinion. (Pl.'s Br., ECF #10, PageID 989). In particular, he believes the opinion of PT Wood, who indicated Mr. Espino should be limited to light exertion and subject to various limitations, should control the RFC. (*Id.*). According to Mr. Espino, in discounting PT Wood's opinion and failing to adopt exertional, manipulative, and postural limitations from any one opinion, the ALJ was left with no medical opinion on upon which to base the RFC and therefore erred in failing to obtain another medical source opinion. (*Id.* at PageID 993). For the reasons below, I find no merit to these arguments.

**I.      Substantial evidence supports the ALJ's evaluation of PT Wood's opinion.**

Because Mr. Espino filed his application after March 27, 2017, medical opinions are evaluated under the regulations found in 20 C.F.R. § 404.1520c. Under these revised regulations, the ALJ is to articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." *Id.* at § 404.1520c(b). The regulations define a medical opinion as "a statement from a medical source about what [the claimant] can still do despite [the claimant's] impairment(s) and whether [the claimant has] one or more impairment-related limitations or restrictions" in the ability to perform physical demands of work activities, the ability to perform mental demands of work activities, the ability to perform other demands of work, and the ability to adapt to environmental conditions. 20 C.F.R. § 404.1527(a)(1).

16

The ALJ is not required to defer to or give any specific evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not required to give a treating source controlling weight. *See Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). In determining the persuasiveness of a medical opinion, the ALJ considers five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(c)(1)-(5). The ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors" of supportability[4] and consistency.[5] 20 C.F.R. § 404.1520c(a). An ALJ must explain how he or she considered the factors of supportability and consistency, and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See* 20 C.F.R. §§ 416.920c(b)(2)-(3). That said, just because an ALJ does not specifically use the words "supportability" and "consistency" does not mean the ALJ did not consider those factors. *Hardy v. Comm'r of Soc. Sec.*, No. 2:20-cv-4097, 2021 WL 4059310, at *2 (S.D. Ohio Sept. 7, 2021).

In this case, the ALJ evaluated PT Wood's opinion as follows:

---

[4]      "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[5]      "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

Christopher Wood performed a physical therapy functional capacity assessment consultation on October 20, 2021, assessing that the claimant was capable of working at a "sedentary to light work category" based primarily on his orthopedic conditions; constant reaching, fingering and feeling bilaterally; constant handling on the right and occasional handling on the left; occasional head, neck, and trunk rotation; frequent partial squatting, occasional mid-level squatting and no deep squatting; occasional ramps and stairs; and no kneeling or crawling. Mr. Wood noted that such assessment was being performed in order to complete disability paperwork for the claimant's representative, in connection with his application for disability benefits. Mr. Wood further noted that the claimant did report worsening lower back pain and left knee pain during the evaluation, with many of the limitations noted herein based upon complaints of knee pain, left upper extremity pain, or complaints of dizziness. This opinion is partially persuasive for several reasons. First, the undersigned notes that these opinions as to functional limitations were not supported by examination results, but rather based primarily on the claimant's own self reporting and/or self limiting behavior, with Mr. Wood acknowledging, noting that overall the claimant demonstrated little to no change in mechanics or compensation, other than his verbal reports of worsening pain. Additionally, such limitations are not consistent with the record as a whole. For example, while the claimant was noted with strength deficits and limitations as to handling with his left upper extremity due to self-reported left wrist pain, just a few months earlier, at the consultative examination, no such strength deficits were observed and the claimant had no issues with gross or fine motor functioning. Further, the claimant admitted to recent exacerbation of his back and leg pain based upon having shoveled gravel for several hours the day before the examination, suggesting that some of his complaints at the examination were related to acute issues related to recent arduous work activity, rather than his overall functional abilities outside of the period of exacerbation. This is further evident by considering that the claimant denied any problems with walking at the consultative examination a few months earlier, with only mild pain noted in his SI joint and relatively normal range of motion and motor strength. Additionally, such limitations in functioning are not consistent with the claimant's own reported activities, which included shoveling gravel for several hours, a relatively strenuous task, just one day before this assessment. Thus, these opinions were neither supported, nor consistent with the record as a whole. Additionally, the undersigned notes that this assessment was provided by an occupational therapist, who is not an acceptable medical source. Finally, the undersigned notes that the providers that assessed the claimant's functioning were working within the VA system, rather than Social Security Disability System, with no indication as to their familiarity with the program requirements specific to our evaluations. Therefore, this opinion is partially persuasive.

(Tr. 294-95) (citations omitted).

18

The above analysis comports with the applicable regulations and is supported by substantial evidence. The more relevant the objective medical evidence and supporting explanations presented by PT Wood to support his opinion, the more persuasive the opinion and finding will be. *See* 20 C.F.R. § 404.1520c(c)(1). The more consistent PT Wood's opinion is with the evidence from other medical and nonmedical sources, the more persuasive the opinion and findings will be. *See* 20 C.F.R. § 404.1520c(c)(2).

The ALJ identified two issues in the supportability of PT Wood's opinion: (1) the opinions as to functional limitations were not supported by examination results, but rather primarily on Mr. Espino's self-reported symptoms that Mr. Espino himself acknowledged; and (2) on examination, Mr. Espino demonstrated little to no change in mechanics or compensation, other than his verbal reports of worsening pain. (Tr. 294).

In terms of consistency, the ALJ pointed out various record evidence inconsistent with PT Wood's opinion:

- Mr. Espino's strength deficits and limitations as to handling with his left upper extremity due to self-reported left wrist pain were inconsistent with a consultative examination just a few months earlier where no such strength deficits were observed and he had no issues with gross or fine motor functioning.

- Exacerbation of his back and leg pain was the result of having shoveled gravel for several hours the day before the examination rather than his overall functional abilities.

- Proposed limitations were inconsistent with records reflecting Mr. Espino denied problems with walking at a consultative examination a few months earlier, with only mild pain noted in his SI joint and relatively normal range of motion and motor strength.

- Proposed limitations were also inconsistent with his ability to shovel gravel for several hours, a relatively arduous activity.

19

(Tr. 294-95).

It is not necessary for the ALJ to "perform an exhaustive, step-by-step analysis of each factor." *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 785 (6th Cir. 2017). Instead, the ALJ need only "provide 'good reasons' for both her decision not to afford the [medical source] opinion controlling weight and for her ultimate weighing of the opinion.'" *Id.* (quoting *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804-05 (6th Cir. 2011)). Lack of sufficient rationale, internal inconsistency, inconsistency with the evidence of record, and lack of support for many of the proffered limitations are all "good reasons" backed by substantial evidence. *Makela v. Comm'r of Soc. Sec.*, No. 22-1047, 2022 WL 9838285 (6th Cir. Oct. 17, 2022). The ALJ identified all four here.

Reading the record as a whole, I find substantial evidence supports the ALJ's evaluation of PT Wood's examination and opinion. In finding the opinion only partially persuasive, the ALJ explained his reasoning and provided sufficient rationale, supported by record evidence, in explaining his conclusion. Even if substantial evidence also supports the more stringent limitations Mr. Espino proposes, "when a record presents substantial evidence supporting two contrary conclusions, a reviewing court must affirm the findings of the Commissioner." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp. 2d 954, 960 (N.D. Ohio 2003) (citing *Buxton*, 246 F.3d at 772). I find no procedural or regulatory error in the ALJ's analysis of the opinion's supportability or consistency, and that analysis is supported by substantial evidence. Mr. Espino's first argument is not well-taken.

II.    **The ALJ did not err in not obtaining an additional medical source opinion as to Mr. Espino's exertional, postural, and manipulative limitations.**

Mr. Espino argues if the ALJ found PT Wood's opinion a non-acceptable medical source, the ALJ was required to obtain an additional medical source opinion because, without one, the ALJ could not determine Mr. Espino's exertional, postural, and manipulative limitations. (Pl.'s Br., ECF #10 at PageID 992).

As a threshold matter, the ALJ correctly determined that a physical therapist is not an acceptable medical source. Mr. Espino argues the discounting of PT Wood's opinion as a non-acceptable medical source "did not stop the ALJ from also finding the opinion partially persuasive, completely contradicting the argument that it was not an acceptable opinion, without bothering to offer explanation." (*Id.*). The explanation is found at 20 C.F.R. § 404.1520c, which requires consideration of medical opinions from both acceptable medical sources and non-acceptable medical sources under the same framework. *See, e.g.*, *Hannahs v. Comm'r of Soc. Sec.*, No. 20-CV-01905, 2021 WL 8342817 (N.D. Ohio Dec. 15, 2021) (finding that a physical therapist is not an acceptable medical source but still a medical source whose opinion must be considered); *see also Butler v. Comm'r of Soc. Sec.*, No. 20-CV-10836, 2021 WL 4755608, at *10 (E.D. Mich. Mar. 23, 2021) (finding that ALJ was required to evaluate opinion from an occupational therapist "as a medical opinion, albeit a non-acceptable one"), *report and recommendation adopted*, 2021 WL 4472773 (E.D. Mich. Sept. 30, 2021). The ALJ properly identified PT Wood's opinion as a non-acceptable, but still medical source opinion requiring consideration (as opposed to nonmedical source opinions, which need not be considered, *see* 20 C.F.R. § 404.1502c(d)).

Without PT Wood's opinion, Mr. Espino claims the record lacked *any* opinion regarding his exertional, postural, or manipulative limitations, which he argues indicates the ALJ did not

21

properly develop the record. (Pl.'s Br., ECF #10 at PageID 992). The premise of the argument is not accurate—as explained above, the ALJ did not ignore PT Wood's opinion entirely; rather, he found it partially persuasive. (Tr. 294-95). Mr. Espino is correct, however, that no other medical source the ALJ considered opined as to exertional, postural, or manipulative limitations, raising questions as to the evidence on which the ALJ based those limitations.

PT Wood believed Mr. Espino should be limited to sedentary exertion; occasionally handle on the left side; occasionally rotate his head/neck; occasionally rotate the trunk bilaterally, occasionally stoop and climb ramps or stairs; never kneel or crawl; and frequently lift up to 20 pounds. (Tr. 846, 863). By contrast, the ALJ found Mr. Espino could perform medium exertion work; frequently reach, handle, finger, and feel bilaterally; frequently stoop and climb ramps or stairs; frequently kneel, crouch and crawl; and frequently lift up to 25 pounds (as is set forth in the definition of "medium work" at 20 C.F.R. §§ 404.1567(c) and 416.967(c)). (Tr. 286). Thus, despite finding PT Wood's opinion "partially persuasive," the ALJ rejected all of PT Wood's opined exertional, postural, and manipulative limitations. No other medical source considered by the ALJ considered opined on these limitations.[6]

---

[6]     The ALJ stated: "Like Dr. Ceasar, Dr. Schell declined to assess exertional, postural, or manipulative limitations. . ." (Tr. 293). This misstates the record. On reconsideration, Dr. Schell found no exertional, postural, or manipulative limitations. (Tr. 356). Nothing in Dr. Schell's "RFC Additional Explanation" referenced a lack of evidence preventing him from determining those limitations. (Tr. 357). This inquiry, however, rests on what evidence the ALJ relied on in determining the RFC. Because the ALJ mistakenly believed Dr. Schell did not opine on the exertional, postural, or manipulative limitations, I am left to assume the ALJ believed the only medical source opining on the limitations was PT Wood.

Mr. Espino does not identify this mistake as error, and courts are not required to assume substantive challenges not articulated. *See Moore v. Comm'r of Soc. Sec.*, 573 Fed. App'x 540 (6th Cir. 2014). Even still, Dr. Schell's proposed limitations (or lack thereof) are far less stringent than those the ALJ adopted, making any failure to consider or adopt Dr. Schell's opinion harmless

An ALJ is responsible for developing the complete medical history, including arranging for a consultative examination if necessary. 20 C.F.R. § 404.1545(a)(3). This is because the ALJ and the court "are generally unqualified to interpret raw medical data and make medical judgments concerning the limitations that may reasonably be expected to accompany such data." *Alexander v. Kijakazi*, No. 20-CV-01549, 2021 WL 4459700, at *9 (N.D. Ohio Sept. 29, 2021); *see Mascaro v. Colvin*, No. 16-CV-0436, 2016 WL 7383796, at *11 (N.D. Ohio Dec. 1, 2016) (noting neither the ALJ nor the court had the medical expertise to conclude whether the results of a neurological exam necessarily ruled out the existence of a disabling condition).

Where an ALJ has opinions accounting for the majority of the medical evidence, he may reasonably make judgments on the supportability and consistency of the medical opinions and can adopt an RFC accordingly. *Fergus v. Comm'r of Soc. Sec.*, No. 20-CV-02612, 2022 WL 743487 (N.D. Ohio Mar. 11, 2022) (citing *Kizys v. Comm'r of Soc. Sec.*, No. 10-CV-25, 2011 WL 5024866, at *1-2 (N.D. Ohio Oct. 21, 2011) (holding that an ALJ's decision is not supported by substantial evidence if the ALJ must interpret a substantial portion of the medical evidence without the assistance of a medical opinion)).

An ALJ's obligation to obtain an additional medical source opinion is governed by the *Deskin* rule, which states:

> ...[when] the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated nonexamining agency opinion), to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing. This responsibility can be satisfied without such opinion only in a limited number of cases [in which] the medical evidence

---

error. *See Beard v. Saul*, No. 2019 WL 5684454 at *12, n.10 (N.D. Ohio, Nov. 1, 2019) ("The Court need not remand where doing so is futile.").

shows relatively little physical impairment and an ALJ can render a commonsense judgment about functional capacity.

*Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp.2d 908, 912 (N.D. Ohio 2008) (quotation marks and citation omitted). Following criticism from other district courts in this Circuit, *see Henderson v. Comm'r of Soc. Sec.*, No. 08-CV-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010), the *Deskin* rule was limited to only two circumstances: (1) when an ALJ made an RFC determination based on no medical source opinion; or (2) when an ALJ made an RFC based on an "outdated" medical source opinion "that does not include consideration of a critical body of objective medical evidence." *Kizys*, 2011 WL 5024866, at *2. The former created an "off-shoot" of cases potentially applicable here, where source opinions exist, but the ALJ rejected them and formed his own opinion.

In *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 Fed. App'x 395 (6th Cir. 2018), the claimant argued the ALJ erred in assessing his RFC by giving no weight to nearly all the physicians' opinions regarding his ability to stand, walk, or reach, therefore obligating the ALJ to obtain another physician opinion before setting the RFC. *Id.* at 401. The Sixth Circuit disagreed:

> We have previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ. *See Shepard v. Comm'r of Soc. Sec.*, 705 Fed.Appx. 435, 442–43 (6th Cir. 2017) (rejecting the argument that "the ALJ's [residual functional capacity] lacks substantial evidence because no physician opined that [the claimant] was capable of light work"); *Rudd v. Comm'r of Soc. Sec.*, 531 Fed.Appx. 719, 728 (6th Cir. 2013) (rejecting the same argument because "the ALJ is charged with the responsibility of determining the [residual functional capacity] based on her evaluation of the medical and non-medical evidence"). We similarly find no error here. The ALJ undertook a laborious evaluation of the medical record when determining the residual functional capacity, and substantial evidence supports the ALJ's conclusions.

*Id.* at 401-02.

Two years later, in *Falkosky v. Comm'r of Soc. Sec.*, No. 19-CV-2632, 2020 WL 5423967 (N.D. Ohio, Sept. 10, 2020), a claimant challenged the ALJ's decision rejecting the opinions of state-agency reviewing physicians who found insufficient evidence to determine how the claimant's severe carpal tunnel syndrome affected his functional abilities. *Id.* at *6. The ALJ rejected those opinions due to Mr. Falkosky's failure to obtain more aggressive treatment during the relative time period, which the court found improper: "[a]bsent from the ALJ's decision is any explanation of how he could make a detailed RFC finding when the reviewing physicians could not[.]" *Id.* "A physician may have had the expertise to opine that Falkosky's decision to pursue conservative treatment was indicative of his ability to perform work at the medium exertional level. But the ALJ did not have such expertise." *Id.* at *7.

The *Falkosky* Court went on to distinguish *Mokbel-Aljahmi*:

> The Commissioner argues that the ALJ was not required to base his RFC on any one medical opinion. I agree. In *Mokbel-Aljahmi*, the Sixth Circuit held that the ALJ was not required to obtain an opinion from another physician after assigning no weight to a medical opinion in the record. But in *Mokbel-Aljahmi*, the ALJ had rejected a medical source opinion that the claimant was limited to less than light work because that same physician had noted that the claimant's muscle bulk and tone were normal, as was his gait. Thus, the same evidence supporting the rejection of a medical source opinion also supported the ALJ's RFC finding.

> Support for an ALJ's RFC finding is often described in the rejection of a medical opinion because [evaluating medical source opinions] requires an ALJ to cite evidence from the record supporting the weight assigned to such an opinion. The *Kizys* court recognized this phenomena in distinguishing the *Henderson* case. In *Henderson*, which rejected the *Deskin* rule, the ALJ had analyzed at least three medical opinions related to the claimant's functional limitations. The *Kizys* court noted that, in *Henderson*, the ALJ had three medical source opinions as "a guide to peg a residual functional capacity finding." So, even though the ALJ had rejected the physicians' opinions, he had done so based on other evidence in the record related to the claimant's functional limitations. In contrast, Falkosky's record contained no medical opinions on his functional limitations. Thus, the ALJ had no medical opinions on Falkosky's functional abilities to evaluate. And any evidence of

> Falkosky's condition that he cited to support his RFC finding necessarily supported only his own lay conclusion regarding Falkosky's functional capacity.

*Id.* (citations omitted).

Most recently, this court followed *Mokbel-Aljahmi* in *Fergus v. Comm'r of Soc. Sec.*, 20-CV-02612, 2022 WL 743487 (N.D. Ohio, Mar. 11, 2022). The claimant, represented by the same counsel as Mr. Espino, brought an identical challenge to the one in this case: the ALJ's RFC was constructed from "whole cloth" because the ALJ rejected the opinions of both state agency medical consultants and the claimant's treating physician. *Id.* at *5. The court rejected the argument:

> Instead of not having any opinions on functional limitations as in *Falkosky*, the ALJ here had three and determined an RFC that fell somewhere between the severe limitations of Dr. Chen and the less severe limitations of the state agency reviewing physicians. An ALJ's RFC determination may be supported by substantial evidence, even if no "physician offers an opinion consistent with that of the ALJ. . . . Plaintiff's argument that by not adopting any of the three medical opinions, the ALJ was left with no medical opinion at all is not well-taken. The opinions did not cease to exist simply because the ALJ did not adopt them. Instead, the ALJ considered them in crafting the RFC. Her refusal to base the RFC off a single medical opinion does not, alone, constitute error.

*Id.* at *9-10.

None of these cases is exactly on point. Here, the ALJ based the RFC on one opinion he found only "partially persuasive," and to the extent he found the opinion not persuasive, he filled in the gaps with his own analysis of the medical evidence of record. Taking the rule from *Mokbel-Aljahmi*, the inconsistency of the ALJ's RFC with PT Wood's opinion is not, on its own, error.

But unlike *Henderson* and *Fergus*, where the ALJ had three medical source opinions as a guide to peg the RFC finding, the ALJ here only had one. With only one opinion, the ALJ could not create an RFC that fell somewhere between the severe limitations of one opinion and the less severe limitations of another, as in *Fergus*. Like *Henderson*, even though the ALJ rejected the

opinion, he did so "based on other evidence in the record related to the claimant's functional limitations." *Falkosky*, 2020 WL 5423967, at *7 (citing *Kizys*, 2011 WL 5024866, at *5 and *Henderson*, 2010 WL 750222, at *2).

*Falkosky* provides the only framework under which the ALJ in this case may have erred. Detailed review of *Falkosky*'s transcript reveals a strikingly barren RFC determination, with the ALJ iterating two state-agency medical sources who both declined to opine on any limitations due to insufficient evidence, then unilaterally imposing his own view of what the claimant could do without citing any medical evidence. *See* Docket No. 1:19-CV-02632-TMP, ECF #8, PageID 64. By contrast, the RFC determination in this case makes meticulous reference to Mr. Espino's medical history and fully describes the evidence supporting the ALJ's determination. I therefore find no error in the ALJ's decision not to obtain an additional source opinion. It is clear the ALJ based the RFC on the same evidence he relied upon in rejecting PT Wood's opined limitations, as in *Henderson*, *Fergus*, and *Mokbel-Aljahmi*.

The potential impact of extending *Falkosky*'s ruling to this case provides further support for this conclusion. Doing so would create a de facto regulation whereby an ALJ would be bound to adopt the limitations set forth in a single medical source opinion or be forced to obtain an additional opinion, creating a two-opinion minimum for the ALJ to exercise judgement in determining limitations. The Administration has not imposed such a regulation, and a jurisprudential creation of one would interfere with an ALJ's "final responsibility for determining an individual's RFC," which is an administrative finding "reserved to the Commissioner." *Shepard v. Comm'r of Soc. Sec.*, 705 Fed. App'x 435, 442 (6th Cir. 2017). Mr. Espino's second argument is not well-taken.

CONCLUSION

Following review of the arguments presented, the record, and the applicable law, I

**AFFIRM** the Commissioner's decision denying disability insurance benefits and supplemental

security income.

Dated: June 21, 2023


_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

28